IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No. | 1:18-CR-75 (MAD) |
| | ) | | |
| v. | ) | **Information** | |
| | ) | | |
| **OLAF TEPPER,** | ) | Violation: | 50 U.S.C. §§ 1705(a), (c) |
| | ) | | [Conspiracy to Violate the |
| | ) | | International Emergency |
| | ) | | Economic Powers Act and |
| | ) | | U.S. Sanctions Against Iran] |
| | ) | | |
| | ) | 1 Count | |
| | ) | | |
| **Defendant.** | ) | County of Offense: | Saratoga |

## THE UNITED STATES ATTORNEY CHARGES:

### Background

At all times relevant to this Information:

1. The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1706, authorized the President of the United States to impose economic sanctions on another country in response to an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and when the President declares a national emergency with respect to that threat.

2. On March 15, 1995, the President issued Executive Order (EO) 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and on that date declared a national emergency to deal with that threat.

3. To implement EO 12957 and other, related EOs, the United States Office of Foreign Assets Control (OFAC) issued the Iranian Transactions and Sanctions Regulations

(ITSR), 31 C.F.R. Part 560. With certain limited exceptions not applicable here, the ITSR prohibited, among other things, the export, re-export, sale, and supply, directly and indirectly, from the United States and by a United States person, wherever located, to Iran and the Government of Iran, and the financing of such export, re-export, sale, and supply, of any goods, technology, and services, without prior authorization from OFAC. These regulations further prohibited any transactions that evade and avoid, and have the purpose of evading or avoiding, any of the prohibitions contained in the ITSR, including the unauthorized exportation of goods from the United States to a third country if the goods are intended and destined for Iran.

4. The President has continued the national emergency with respect to Iran. The most recent continuation of this national emergency was on November 6, 2017.

5. The defendant **OLAF TEPPER** (**"TEPPER"**) was a German citizen residing in Germany.

6. **TEPPER** was the Managing Director of Energy Republic GmbH ("Energy Republic"), an export company based in Cologne, Germany, which he founded.

7. **MOJTABA BIRIA** (**"BIRIA"**) was a German citizen, originally from Iran, who served as Energy Republic's Technical Managing Director.

8. "Company A," based in Saratoga County, New York, sold parts for installation and use in gas turbine engines.

9. Energy Republic was a longtime distributor of goods from Company A. Energy Republic ordered and paid for gas turbine parts, which Company A sent to Germany and which, upon arrival in Germany, Energy Republic then shipped to Iran.

10. The ITSR prohibited the export and re-export of these gas turbine parts to Iran in the absence of a license from OFAC. Neither **TEPPER** nor Energy Republic nor Company A had

2

an OFAC export license that would have allowed him to export U.S. goods directly or indirectly to Iran.

## COUNT 1
### [Conspiracy to Violate the International Emergency Economic Powers Act and U.S. Sanctions against Iran]

11.     Paragraphs 1 through 10 of this Information are re-alleged and incorporated as if fully set forth herein.

12.     From in or about August 2017 to November 20, 2017, in Saratoga County in the Northern District of New York, and elsewhere, the defendant **OLAF TEPPER** did willfully conspire with **MOJTABA BIRIA** and others to violate orders, regulations and prohibitions issued under Chapter 35 of Title 50 of the United States Code, including regulations set forth in Title 31, Code of Federal Regulations, Part 560 (the Iranian Transactions and Sanctions Regulations), by exporting and causing to be exported goods to a third country with knowledge and reason to know that such goods were intended specifically for re-exportation, directly and indirectly, to Iran, without having first obtained the required authorization from OFAC, in violation of the sanctions imposed on Iran by the United States through the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*.

### Objects of the Conspiracy

13.     The objects of the conspiracy were:

a.  To make money and profits;

b.  To acquire U.S.-origin goods from the United States for shipment to end users in Iran that were customers of Energy Republic;

c.  To avoid and evade U.S. sanctions against Iran; and

3

d. To conceal the prohibited transactions from detection by the United States government so as to avoid penalties and disruption of the illegal activity.

**Manner and Means of the Conspiracy**

14. The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

   a. **TEPPER** and his co-conspirators planned and acted inside and outside of the United States, including in Saratoga County, New York, to acquire gas turbine parts from Company A;

   b. **TEPPER** and his co-conspirators communicated by phone, email, WhatsApp messages and Skype;

   c. **TEPPER** worked with several co-conspirators, including **BIRIA**, to order gas turbine parts from Company A in the United States for delivery to end users in Iran that had ordered the parts from Energy Republic; and

   d. **TEPPER, BIRIA** and other co-conspirators did not obtain a license from OFAC to export from the United States to Iran the goods purchased from Company A in the United States.

**Overt Acts in Furtherance of the Conspiracy**

15. In furtherance of the above-described conspiracy, and in order to carry out the objects thereof, **TEPPER** and his co-conspirators committed and caused to be committed the following overt acts, among others:

   a. Beginning in or about August 2017, **TEPPER** and **BIRIA** attempted to arrange for Company A to ship to Energy Republic, in Germany, gas turbine parts valued at approximately $1 million. **TEPPER** and **BIRIA** planned to purchase

4

these United States goods for end-user electric power plants in Iran. Once Company A shipped the turbine parts from the United States to Germany, Energy Republic, at **TEPPER's** direction, would immediately re-ship them to Energy Republic customers in Iran.

b. In October 2017, **TEPPER** sent to a Company A employee several emails and WhatsApp phone messages offering an immediate down payment of $300,000 to $400,000 for the gas turbine parts valued at approximately $1 million, with the remaining money to be guaranteed by both Energy Republic and **TEPPER** personally.

c. On October 26, 2017, **TEPPER** and **BIRIA** flew to the United States for the purpose of meeting with a Company A employee. The following morning, on October 27, 2017, **TEPPER** and **BIRIA** met with that person at a hotel in Saratoga Springs, Saratoga County, to discuss the proposed approximately $1 million transaction.

d. On or about November 15, 2017, at **TEPPER's** direction, Energy Republic transferred $399,970 to Company A's bank account in the United States, by wire, as a down payment for the approximately $1 million transaction.

All in violation of Title 50, United States Code, Sections 1705(a), (c), and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204.

Dated: March 16, 2018

GRANT C. JAQUITH
United States Attorney

By: /s/

Richard D. Belliss
Michael Barnett
Assistant United States Attorneys
Bar Roll Nos. 515295 and 519140